Johnnie May FRAZIER, individually, and on behalf of the Estate of George L. Frazier, Jr., Plaintiff,

v.

MYLAN INC. f/k/a Mylan Laboratories Inc., et al., Defendants.

Civil Action No. 1:11–CV–03037–MHS.

United States District Court,
N.D. Georgia,
Atlanta Division.

Dec. 18, 2012.

Charles Andrew Childers, Michael Brandon Smith, Childers, Schlueter & Smith, LLC, Atlanta, GA, for Plaintiff.

Dylan M. Carson, Sandy M. Eloranto, Tucker, Ellis & West, LLP, Denver, CO, Ann Marie Byrd, DLA Piper LLP, Atlanta, GA, for Defendants.

### *ORDER*

MARVIN H. SHOOB, Senior District Judge.

Presently before the Court are defendants' motions to dismiss. The Court's rulings and conclusions are set forth below.

*Background*

This is a personal injury and products liability suit brought against the drug manufacturers of the prescription medication phenytoin, sold under the brand name Dilantin.[1] According to the complaint, decedent George L. Frazier was prescribed and ingested phenytoin products, and as a

---

1. The Court will use phenytoin throughout the complaint to refer to both the generic and brand name versions of phenytoin. The Court will differentiate between the brand name Dilantin and the generic version of phenytoin where necessary.

result, he suffered severe and adverse complications, eventually resulting in his death.

On January 6, 2012, the Court entered an Order granting in part and denying in part defendants Mylan's[2] and Pfizer's[3] motions to dismiss. *Moore v. Mylan Inc.*, 840 F.Supp.2d 1337 (N.D.Ga.2012). The Court found that only Johnnie May Frazier, as the surviving spouse of the decedent, had standing to pursue the claims in this case individually and on behalf of the estate. *Id.* at 1343. The Court dismissed with prejudice plaintiff's claims against Mylan for failure to warn and dismissed without prejudice plaintiff's claims for strict products liability based on a design or manufacturing defect, fraud, negligence, gross negligence, and punitive damages. *Id.* at 1344–53. The Court also noted that plaintiff may be able to state a claim with a more carefully drafted complaint and that plaintiff had requested leave to amend. *Id.* at 1353–54. Accordingly, the Court granted plaintiff's request for leave to amend her complaint and allowed her thirty (30) days to file her amended complaint. *Id.* at 1354.[4]

Plaintiff filed an amended complaint. Mylan and Pfizer now move to dismiss plaintiff's amended complaint.

*Legal Standard*

Under both *Twombly* and *Ashcroft,* the Court is required to accept well-pleaded facts, not legal conclusions, as true when considering a motion to dismiss pursuant to Rule 12(b)(6). *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (internal quotations and citations omitted). Instead, the complaint must set forth factual allegations "plausibly suggesting (not merely consistent with)" a violation of the law. *Id.* at 557, 127 S.Ct. 1955.

Accordingly, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955). The *Iqbal* court explained as follows:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

129 S.Ct. at 1949 (internal quotes and citations omitted).

"Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at

**2.** "Mylan" refers to defendants Mylan, Inc. f/k/a Mylan Laboratories, Inc.; Mylan Bertek Pharmaceuticals, Inc.; and Mylan Pharmaceuticals, Inc.

**3.** "Pfizer" refers to defendants Pharmacia Corporation; Pfizer, Inc.; Parke–Davis; and Warmer–Lambert Company LLC.

**4.** For more background details of the case, see *Moore,* 840 F.Supp.2d at 1341–42.

1950 (citation omitted). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R.Civ.P. 8(a)(2)). In further clarifying the *Twombly* standard, the Supreme Court has adopted a two-pronged approach to evaluating motions to dismiss: (1) eliminate any allegations in the complaint that are merely legal conclusions, and (2) where there are well-pleaded factual allegations, "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 129 S.Ct. at 1950.

*Discussion*

**A. Count One—Strict Product Liability—Failure to Warn, against Pfizer**

In its previous Order, the Court barred any claims by plaintiff for a failure to warn the decedent or the public at large due to the learned intermediary doctrine recognized in Georgia. *Moore*, 840 F.Supp.2d at 1343–44; *Presto v. Sandoz Pharms. Corp.*, 226 Ga.App. 547, 548, 487 S.E.2d 70 (1997) (the manufacturer of a prescription drug is not normally required to directly warn the patient of dangers in its use). The Court dismissed all claims against Pfizer except the failure to warn the decedent's prescribing physicians. The Court granted plaintiff leave to amend her complaint to allege a strict liability for a failure to warn claim against the decedent's prescribing physicians and to remove to any allegation that Pfizer had a duty to warn the decedent or the general public.

In plaintiff's amended complaint, she again alleges a failure to warn the decedent, the public at large, and the decedent's prescribing physicians. Her claim for failure to warn against Pfizer is a verbatim copy of her failure to warn claim in her original complaint.[5] In moving to dismiss this claim, Pfizer argues that the Court has already considered plaintiff's claim for a failure to warn the decedent and the public at large and limited the claim to plaintiff's prescribing physicians and that plaintiff is now asking the Court to revisit this ruling.

In response, plaintiff contends that Pfizer failed to warn the public and the decedent by not issuing a medication guide advising the decedent of the risks of the serious side effects of Dilantin. A medication guide is a patient labeling approved by the Food and Drug Administration ("FDA"), which is dispensed directly to the patient. *See* 21 C.F.R. §§ 208.3(h), 208.24(b). Plaintiff asserts that Dilantin met the requirements for issuing a medication guide and had Pfizer "instituted" a medication guide "advising the decedent of the risks" associated with Dilantin, the decedent "would likely still be alive." Pl.'s Resp. in Opp'n to Pfizer's Mot. to Dismiss Pl.'s Am. Compl. ("Pl.'s Resp. to Pfizer's Mot. to Dismiss") at 6.

First, plaintiff has not alleged in her amended complaint that a medication guide was available and approved by the FDA for Dilantin in December of 2008 when the decedent received his medication or in January of 2009 when he died, such that Pfizer could have warned the decedent via a medication guide. Indeed, the earliest medication guide available for Dilantin found by this Court is dated September 2009.[6] Because the FDA did not

---

**5.** The only difference between plaintiff's original complaint and her amended complaint is the addition of two (2) sentences in the amended complaint, which do not make any

allegations about a medication guide. *See* discussion *infra* regarding medication guide.

**6.** A copy of the medication guide from September 2009 is available here: http://www.

approve a medication guide for Dilantin until September 2009, Pfizer could not have had a duty to send one to the decedent before his death in January 2009.

Second, plaintiff contends that one or more of the requirements for issuing a medication guide were present when the decedent died and that Pfizer should have "instituted" a medication guide. Pl.'s Resp. to Pfizer's Mot. to Dismiss at 6. However, even if Dilantin met the requirements for issuing a medication guide, it was up to the FDA to actually determine that a medication guide was necessary and approve the text of such a guide. *See* 21 C.F.R. §§ 208.1(c), 208.24(a).

■ Third, the learned intermediary doctrine would still bar plaintiff's claim because it only requires a duty to warn the physician. *See Bartlett v. Mut. Pharm. Co., Inc.,* 08–CV–00358–JL, 2010 WL 3659789, at *6 (D.N.H. Sept. 14, 2010) (rejecting the plaintiff's failure to warn claim based on not issuing a medication guide because there was no support that medication guides warrant a special exception to the learned intermediary doctrine). Finally, plaintiff's amended complaint does not even mention a medication guide, much less make a claim that Pfizer should have petitioned the FDA to issue a medication guide for Dilantin prior to the decedent's death. *See Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (the plaintiff must provide the grounds of her entitlement to relief beyond mere labels and conclusions). For all of these reasons, the Court dismisses plaintiff's claim against Pfizer for failure to warn the public or the decedent and limits plaintiffs failure to warn claim to the decedent's prescribing physicians.

## B. Count Two—Strict Product Liability—Defective in Design or Manufacture, against all defendants

Plaintiff alleges that Pfizer and Mylan designed, tested, inspected, manufactured, assembled, developed, labeled, sterilized, licensed, marketed, advertised, promoted, sold, packaged, supplied and/or distributed phenytoin in a defective and unreasonably dangerous condition because the drug contained unreasonably dangerous design defects and was not reasonably safe and fit for its intended or reasonably foreseeable purpose. In its previous Order, the Court found that plaintiff's allegations failed to state a claim for strict liability under Georgia law and meet the pleading standard required by *Twombly. Moore,* 840 F.Supp.2d at 1344.

In addition, the Court concluded that any failure to warn claim against Mylan was preempted based on the U.S. Supreme Court's ruling in *PLIVA, Inc. v. Mensing,* —— U.S. ——, 131 S.Ct. 2567, 2573, 180 L.Ed.2d 580 (2011). *Moore,* 840 F.Supp.2d at 1344–49. As the Court explained in its previous Order, in *Mensing,* the plaintiffs sued the generic drug manufacturers that produced metoclopramide pursuant to state law for failing to provide adequate warning labels. 131 S.Ct. at 2573. The plaintiffs alleged that state tort law placed a duty on generic drug manufacturers to use a different, stronger label than the label they actually used. *Id.* at 2577. The generic drug manufacturers urged that federal law preempted the state tort claims because federal statutes and the FDA regulations required them to use the same safety and efficacy labeling as their brand-name counterparts, and therefore, it was impossible for the drug manufacturers

---

pdr.net/drugpages/mgpdfy5550.PDF. Pfizer contends that the earliest medication guide for Dilantin is dated January 2011, which if true, would also support the Court's conclu-sion that an FDA-approved medication guide was not available until after the decedent's death. The Dilantin medication guide submitted by plaintiff is dated October 2011.

to comply with federal law and any state law or tort duty that required them to use a different label. *Id.*

The U.S. Supreme Court held that the plaintiffs' state law claims for failing to produce adequate warning labels were preempted by federal law. *Id.* at 2581. The court explained that a generic drug application must show that the proposed labeling is the same as the labeling approved for the brand name drug, *i.e.*, that the label for the generic drug matches the label for the brand name drug. *Id.* at 2574. Federal drug regulations prevented the generic drug manufacturers from independently changing the generic drug labels. *Id.* Thus, there was a conflict between federal and state law because it was impossible for the generic drug manufacturers to comply with both their state law duty to change the label and their federal law duty to keep the label the same as the brand name drug. *Id.* at 2577–78. The court recognized that "[w]here state and federal law 'directly conflict,' state law must give way," and therefore, the plaintiffs' state law claims were preempted. *Id.* at 2577, 2581.

### 1.  Failure to Warn, against Mylan

Plaintiffs amended complaint still alleges failure to warn claims against Mylan. For the reasons already stated in the Court's previous Order, the Court dismisses these claims with prejudice because they are preempted by *Mensing. See Moore*, 840 F.Supp.2d at 1344–49.

### 2.  Failure to Withdraw Product from the Market, against Mylan [7]

Plaintiff has alleged that a generic drug manufacturer of an obsolete product like phenytoin would have chosen not to market the drug knowing that the risk of injury was completely unnecessary, highly predictable, and certainly foreseeable.

The Court already rejected plaintiff's argument that Mylan was liable for failing to stop selling phenytoin. *Moore*, 840 F.Supp.2d at 1352 n. 14. The Court found that this claim was preempted by *Mensing* because

(1) plaintiff ha[d] not shown that there [was] a state law duty to compel generic drug manufacturers to stop production of a drug, when the manufacturer has authority to produce this drug under federal law, and (2) any such state law duty would directly conflict with the federal statutory scheme in which Congress vested sole authority with the FDA to determine whether a drug may be marketed in interstate commerce.

*Id.*

■  Plaintiffs argument now in response to Mylan's motion to dismiss plaintiff's failure to withdraw claim is unavailing. Specifically, the plaintiffs in *Mensing* raised a failure to withdraw claim in their petition for rehearing before the U.S. Supreme Court, but the Court denied the petition. *PLIVA, Inc. v. Mensing, —— U.S. ——*, 132 S.Ct. 55, 180 L.Ed.2d 924 (2011) (denying petition); 2011 WL 2874547 (U.S.2011) (petition for rehearing). On remand, the Eighth Circuit interpreted *Mensing* to encompass a claim for failure to withdraw a drug from the market, and it vacated the portion of its earlier opinion that accepted a failure to withdraw theory. *Mensing v. Wyeth, Inc.*, 658 F.3d 867 (8th Cir.2011) and 588 F.3d 603, 611 (8th Cir. 2009).

Finally, the weight of authority overwhelmingly concludes that a failure to withdraw claim against a generic manufacturer is preempted by *Mensing. See e.g., Smith v. Wyeth, Inc.*, 657 F.3d 420 (6th Cir.2011) (relying on *Mensing* to affirm judgment for generic manufacturers thereby rejecting the plaintiffs' argument that a

---

7.  *See* Pl.'s Am. Compl. ¶¶ 93, 101.

responsible manufacturer would have suspended sales of the product until the FDA approved an adequate warning) (*see* Appellants' Supp. Ltr. Br., 2011 WL 3662688, at *5–6 (filed Aug. 15, 2011)); *Eckhardt v. Qualitest Pharm. Inc.*, 858 F.Supp.2d 792, 801 (S.D.Tex.2012); *Gross v. Pfizer, Inc.*, 825 F.Supp.2d 654, 658–59 (D.Md.2011); *Strayhorn v. Wyeth Pharm., Inc.*, 887 F.Supp.2d 799, 812–13, 819–20 (W.D.Tenn. 2012); *Johnson v. Teva Pharm. USA, Inc.*, 2:10 CV 404, 2012 WL 1866839, at *5 (W.D.La. May 21, 2012); *Metz v. Wyeth LLC*, 872 F.Supp.2d 1335, 1340–41 (M.D.Fla.2012); *Cooper v. Wyeth, Inc.*, CIV.A. 09–929–JJB, 2012 WL 733846, at *6 (M.D.La. Mar. 6, 2012); *In re Darvocet, Darvon & Propoxyphene Products Liab. Litig.*, 2:11–MD–2226–DCR, 2012 WL 718618, at *3 (E.D.Ky. Mar. 5, 2012); *Bowman v. Wyeth, LLC*, CIV. 10–1946 JNE/ SER, 2012 WL 684116, at *6 (D.Minn. Mar. 2, 2012); *Lyman v. Pfizer, Inc.*, 2:09–CV–262, 2012 WL 368675, at *4 (D.Vt. Feb. 3, 2012). Therefore, the Court dismisses plaintiff's claim against Mylan premised on a failure to withdraw theory.

### 3. Strict Liability, Design Defect, against Mylan

█ Plaintiff alleges that phenytoin was defectively designed by Mylan because it was unreasonably dangerous and the inherent risk of SJS/TEN [8] within phenytoin constitutes a defect under Georgia law. Plaintiff's design defect claim against Mylan is preempted under the logic of *Mensing*. As the Court explained in *Mensing*. generic drug manufacturers have an ongoing federal duty of "sameness" because the generic drug label and brand name drug label must always be the same. 131 S.Ct. at 2574. Therefore, because state law imposed a duty on generic manufacturers to take a certain action regarding the drug labels, but federal law barred them from taking this action, preemption applied. *Id.* at 2581.

With regard to plaintiff's design defect claim against Mylan, a generic drug is designed to be a copy of a reference listed drug and it must be identical in active ingredients and efficacy. *Id.* at 2574 n. 2; *see also* 21 U.S.C. § 355(j)(2)(A). To be admitted into the market for consumers, a generic drug manufacturer must demonstrate the pharmaceutical equivalence and bioequivalence of the generic drug compared to the reference listed drug. 21 U.S.C. § 355(j)(2)(A)(i)-(iii). As the *Mensing* court explained, "generic drugs can gain FDA approval simply by showing equivalence to a reference listed drug that has already been approved by the FDA. This allows manufacturers to develop generic drugs in-expensively, without duplicating the clinical trials already performed on the equivalent brand-name drug." 131 S.Ct. at 2574 (internal citations and quotations omitted). Thus, Mylan was unable to change the design of its phenytoin product because Mylan was required under federal law to produce a drug that was equivalent to the brand name phenytoin, Dilantin.

The overwhelming majority of courts to examine this issue, including two cases in this circuit, have found that the logic of *Mensing* preempts design defect claims. *See In re Accutane Products Liab.*, MDL 1626, 2012 WL 3194952, at *2–3 (M.D.Fla. Aug. 7, 2012); *Metz*, 872 F.Supp.2d at 1340–41.[9] As recognized by *Mensing*,

---

8. "SJS" stands for Stevens–Johnson Syndrome. "TEN" stands for Toxic Epidermal Necrolysis. Plaintiff alleges that they are both life threatening and often deadly conditions. She contends that defendants knew that SJS and TEN were side effects of phenytoin. Plaintiff alleges that the decedent's in-

gestion of phenytoin caused SJS and TEN and eventually led to his death.

9. *See, e.g., Eckhardt,* 858 F.Supp.2d at 801–02; *In re Pamidronate Products Liab. Litig.,* 842 F.Supp.2d 479, 484 (E.D.N.Y.2012); *Jacobsen v. Wyeth, LLC,* CIV.A. 10–0823, 2012

"[w]here state and federal law 'directly conflict,' state law must give way." 131 S.Ct. at 2577. Because Mylan was not free to unilaterally pursue a safer alternative design of phenytoin to comply with state law while also being in compliance with federal law, the Court agrees that *Mensing* applies here.

The First Circuit Court of Appeals has rejected preemption for a design defect claim. *Bartlett v. Mut. Pharm. Co., Inc.,* 678 F.3d 30, 36–37 (1st Cir.2012). The court reasoned that although the generic drug manufacturer defendant could not legally make the drug in another composition, it could choose to not make the drug at all, and whether it made and marketed the drug was left up to the manufacturer. *Id.* at 37–38. Yet, as noted above, the U.S. Supreme Court refused to take up this failure to withdraw argument, and the Eighth Circuit and Sixth Circuit found that *Mensing* rejected a failure to withdraw from the market claim. *Mensing v. Wyeth, Inc.,* 658 F.3d 867 (8th Cir.2011); *Smith v. Wyeth, Inc.,* 657 F.3d 420 (6th Cir.2011).

Additionally, the First Circuit rested its decision on the fact that *Mensing* had not specifically addressed design defect claims. *Bartlett,* 678 F.3d at 38. Although it is true that the *Mensing* court did not address design defect claims, this Court finds that the logic of *Mensing* is applicable to design defect claims. Just as in *Mensing,* conflict preemption applies because Mylan cannot comply with both a state law duty to make a safer design and the federal requirement that the generic drug design be the equivalent of the brand name drug. 131 S.Ct. at 2581 (preemption was appro-

priate where state law imposed a duty on the generic drug manufacturers to take a certain action but federal law barred them from taking this action).

Finally, courts have continued to find preemption applicable to design defect claims even after *Bartlett.* *Pirello v. Qualitest Pharm., Inc.,* CIV.A. 10–298–BAJ, 2012 WL 5363243, at *4 n. 3 (M.D.La. Oct. 30, 2012) (rejecting *Bartlett*); *In re Darvocet, Darvon & Propoxyphene Products Liab. Litig.,* 2:11–MD–2226–DCR, 2012 WL 2457825, at *1 (E.D.Ky. June 22, 2012) (rejecting *Bartlett*); *see, e.g., Johnson,* 2012 WL 1866839, at *5 n. 13; *Aucoin,* 2012 WL 2990697, at *8; *In re Accutane Products Liab.,* MDL 1626, 2012 WL 3194952, at *2–3; *Jacobsen,* 2012 WL 3575293, at *9; *see also Demahy,* 2012 WL 5261492, at *6 (dicta). This Court agrees that the failure to withdraw theory is not availing, and plaintiff has not persuaded the Court that preemption is not appropriate here. Accordingly, the Court dismisses plaintiff's strict liability design defect claim against Mylan.

4. Strict Liability, Design Defect, against Pfizer

Pfizer makes several arguments for why the Court should dismiss plaintiffs strict liability design defect claim. First, Pfizer asserts that plaintiff's design defect claim is preempted. Second, Pfizer contends that plaintiff has not stated the specific defect in phenytoin's design which forms the basis for plaintiffs claim, and she has failed to allege a feasible alternative design to phenytoin.

WL 3575293, at *9 (E.D.La. Aug. 20, 2012); *Aucoin v. Amneal Pharm., LLC,* CIV.A. 11–1275, 2012 WL 2990697, at *8 (E.D.La. July 20, 2012); *Johnson,* 2012 WL 1866839, at *4; *In re Darvocet,* 2012 WL 718618, at *3; *Lyman,* 2012 WL 368675, at *4; *In re Fosamax (Alendronate Sodium) Products Liab. Litig.*

*(No. II),* MDL 2243, 2011 WL 5903623, at *6 (D.N.J. Nov. 21, 2011); *see also Demahy v. Schwarz Pharma, Inc.,* 11–31073, 2012 WL 5261492, at *6 (5th Cir. Oct. 25, 2012) (stating as dicta that design defect claim would be preempted under *Mensing*).

### i. Preemption

Pfizer argues that the Federal Food Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, and related FDA regulations preempt plaintiff's design defect claims because the claims are an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. Pfizer asserts that plaintiff's theories rest on the principle that a jury may be able to second-guess the FDA's decision to approve phenytoin as a safe and effective drug. Even though the FDA has approved the drug, Pfizer contends that plaintiff's claims would permit a jury to find that Pfizer's phenytoin should be pulled from the market. Pfizer contends that the FDA has already made a risk-utility analysis, and therefore, federal law preempts plaintiff's claims because these claims stand in the way of fulfilling Congress' objectives.[10]

Plaintiff responds that the U.S. Supreme Court has expressly rejected the argument that the FDA's determination of a safe and effective drug leaves no room for a state law judgment. Instead, plaintiff contends that such a determination would be at odds with Congress' purpose in enacting the FDCA.

▮▮▮ Regarding whether state law stands as an obstacle to the intent of Congress, Pfizer has not pointed to any aspect of the statutory language of the FDCA or its legislative history which demonstrates that Congress intended to preempt state law in the area of a design defect for a brand name drug manufacturer. *See Sykes v. Glaxo–SmithKline*, 484 F.Supp.2d 289, 320 (E.D.Pa.2007) (finding nothing in the FDCA, as implemented by the FDA,

to preempt design defect claims against drug manufacturers). As explained by the U.S. Supreme Court, "[i]f Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70–year history ... [but] Congress has not enacted such a provision for prescription drugs." *Wyeth v. Levine*, 555 U.S. 555, 574, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009).

Pfizer contends that FDA approval is the final say regarding the safety of a prescription drug and juries are not permitted to second guess the FDA's determination that a drug is safe. However, this runs afoul of Congress' purpose in enacting the FDCA. *Id.* "Congress enacted the FDCA to bolster consumer protection against harmful products." *Id.* Instead of providing a federal remedy for consumers harmed by unsafe or ineffective drugs, Congress determined that "widely available state rights of action provided appropriate relief for injured consumers." *Id.* As recognized by the U.S. Supreme Court, tort suits brought under state law "uncover unknown drug hazards," "provide incentives for drug manufacturers to disclose safety risks promptly," and "serve a distinct compensatory function that may motivate injured persons to come forward with information." *Id.* at 579, 129 S.Ct. 1187. Therefore, state law "offers an additional, and important, layer of consumer protection that complements FDA regulation," rather than standing as an obstacle to Congress' objectives as Pfizer argues here. *See id.* Congress' silence about a preemption for prescription drugs, "coupled with its certain awareness of the

---

**10.** Pfizer's arguments fall under "conflict preemption." Conflict preemption occurs where "it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full pur-

poses and objectives of Congress." *Sprietsma v. Mercury Marine, a Div. of Brunswick Corp.*, 537 U.S. 51, 64, 123 S.Ct. 518, 154 L.Ed.2d 466 (2002) (internal citations and quotations omitted).

prevalence of state tort litigation, is powerful evidence that Congress did not intend FDA oversight to be the exclusive means of ensuring drug safety and effectiveness." *Id.* at 575, 129 S.Ct. 1187.

In addition, Pfizer has not shown that FDA approval itself mandates preemption. *See Torkie–Tork v. Wyeth*, 739 F.Supp.2d 895, 900 (E.D.Va.2010) ("FDA approval of a drug does not preempt an action for defective design."); *see also Wyeth*, 555 U.S. at 575, 129 S.Ct. 1187 (rejecting the argument that because the FDCA requires the FDA to determine that a drug is safe and effective, the agency must be presumed to have performed a precise balancing of risks and benefits and to have established a standard that leaves no room for different state-law judgments); *Kociemba v. G.D. Searle & Co.*, 680 F.Supp. 1293, 1298–99 (D.Minn.1988) (finding that "the mere fact that [the drug] received FDA approval does not, by itself, indicate that Congress impliedly intended to preclude state tort actions against prescription drug manufacturers.").

The FDCA does not establish "both a floor and a ceiling for drug regulation." *Wyeth*, 555 U.S. at 573, 129 S.Ct. 1187. Courts have generally found that FDA regulations with regard to design are minimum standards and FDA approval does not shield a manufacturer from liability. *See Torkie–Tork*, 739 F.Supp.2d at 900; *Eve v. Sandoz Pharm. Corp.*, IP· 98–1429–C–Y/S, 2002 WL 181972, at *3 (S.D.Ind. Jan. 28, 2002) (collecting cases); *Kociemba*, 680 F.Supp. at 1299. Therefore, contrary to Pfizer's arguments, a jury's consideration and evaluation of the safety of a prescription drug does not frustrate the objectives of Congress. *See Kociemba*,

680 F.Supp. at 1299 (rejecting the defendant's argument that a jury finding under state law that a drug is unreasonably dangerous conflicts with the FDA's approval of the drug because Congress did not give drug manufacturers immunity from personal tort actions).

Pfizer maintains that preemption is appropriate because there is a conflict between a federal law allowing Pfizer to sell phenytoin as currently designed and a duty under state law to stop selling phenytoin.[11] The Court finds that Pfizer has not shown that it faced a conflict between a state law and a federal law regarding the design of phenytoin.

Pfizer has pointed to no federal requirement mandating that Pfizer's product be designed in a certain way or asserted that the FDA requires a certain design. Pfizer was free to change the design of its drug, including changing it to meet state law, without a federal law prohibiting such action. This is unlike *Mensing*, where if the generic manufacturers had independently changed their labels to satisfy their state law duty, they would have violated federal law requiring that the generic labels match the brand name labels.

Additionally, the mere fact that the FDA approved Pfizer's phenytoin does not establish that the FDA would have prohibited Pfizer from changing the design of phenytoin. *See Wyeth*, 555 U.S. at 573, 129 S.Ct. 1187 (the mere fact that the FDA approved the brand name drug label did not establish that the FDA would have prohibited the manufacturer from changing the label). The FDA's approval of phenytoin does not amount to a federal law, which then conflicts with a state law

---

11. In support of its position, Pfizer cites to the Court's language from its previous Order. *See Moore*, 840 F.Supp.2d at 1352 n. 14. However, there the Court held that a failure to withdraw claim was barred against Mylan, the generic manufacturer, not Pfizer, based on *Mensing*. *Mensing* did not address claims brought against a brand name drug manufacturer like Pfizer.

duty. Instead, as explained above, FDA approval is a minimum standard and Congress intended state law to complement the FDCA. Thus, Pfizer has not shown that there is a conflict between a federal law and a state law requiring preemption. *See Mensing,* 131 S.Ct. at 2579 (a state and federal law conflict where it is impossible for a private party to do independently under federal law what state law requires of it). The Court concludes that FDA approval of Pfizer's product does not preempt plaintiff's design defect claim. *See Sykes,* 484 F.Supp.2d at 320–21 (finding no preemption and holding that nothing in the FDCA or the FDA regulations prevented the plaintiff from pursuing a state law claim for defective design); *see also Torkie–Tork,* 739 F.Supp.2d at 900 (finding that FDA approval of a drug does not preempt an action for defective design); *Kociemba,* 680 F.Supp. at 1299.

### ii. Pleading a Design Defect Claim

As explained in the Court's previous Order, "strict liability is imposed for injuries suffered because the property when sold by the manufacturer was not merchantable and reasonably suited to the use intended and its condition when sold is the proximate cause of the injury sustained." O.C.G.A. § 51–1–11(b). However, Georgia has recognized that some products, like pharmaceutical drugs, are incapable of being made safe. *Bryant v. Hoffmann–La Roche, Inc.,* 262 Ga.App. 401, 403, 585 S.E.2d 723 (2003); *see also Swicegood v. Pliva, Inc.,* CIV.A 107CV1671TWT, 2010 WL 1138455, at *4 (N.D.Ga. Mar. 22, 2010). Comment k to 402A of the Restatement (Second) of Torts describes this concept:

> Unavoidably unsafe products: There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs.... Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

Restatement (Second) of Torts § 402A (1965).

▬ Comment k is an affirmative defense to avoid strict liability for drug manufacturers. *Bryant,* 262 Ga.App. at 406, 585 S.E.2d 723. After a plaintiff establishes a prima facie case for design defect, "a pharmaceutical manufacturer will be relieved from strict liability only when it demonstrates that it has met the requirements of Comment k." *Id.* To do so, the manufacturer must demonstrate that "(1) the product is properly manufactured and contains adequate warnings, (2) its benefits justify its risks, and (3) the product was at the time of manufacture and distribution incapable of being made more safe." *Id.* Thus, in the context of pharmaceutical

drugs, the "defect" arises from the fact that the manufacturer of the unavoidably unsafe product did not properly manufacture the drug or include warnings; the benefits of the unsafe drug did not outweigh its risks; or the manufacturer was capable of making the product more safe. It is the fact that the drug is alleged to be unavoidably unsafe that places it in this special category of strict liability claims versus a more traditional design defect claim wherein a plaintiff would allege a specific defect in the product.

■ Plaintiff alleges in her amended complaint that Pfizer's phenytoin product was defective because it was unreasonably dangerous due to the inherent risk of causing SJS/TEN. Pfizer contends that plaintiff has failed to properly allege a defect and that the risk or danger of phenytoin is an insufficient defect. The Court does not read plaintiff's amended complaint so strictly. Instead, plaintiff has pled that phenytoin is an unreasonably unsafe product, thereby falling into the category of pharmaceutical drugs that are incapable of being made safe and Comment k. She has alleged a prima facie case for design defect: Pfizer's phenytoin at the time it was sold was unreasonably dangerous due to the inherent risks of the product, and the decedent suffered from SJS/TEN as a result of phenytoin, which eventually resulted in his death. Plaintiff alleges in her amended complaint that the decedent "was prescribed three (3) × 100 mg EXT Phenytoin at Trinity Hospital of Augusta, Georgia, with the internal hospital code of 7210297, and a cost of $15.00 or $5.00 each, on December 20, 2008." Pl.'s Am. Compl.

¶ 15. Plaintiff asserts that this phenytoin was manufactured, marketed, and/or distributed by Pfizer, or in the alternative, by Mylan. Therefore, plaintiff has sufficiently alleged a causal link between Pfizer's phenytoin [12] and the decedent's injuries. Thus, plaintiff has alleged a plausible claim. *See Iqbal,* 129 S.Ct. at 1949.

With regard to the factor of incapable of being made more safe, Pfizer argues that plaintiff has failed to identify a feasible alternative design of phenytoin. However, whether phenytoin was capable of being made more safe is an affirmative defense, and thus the burden rests with Pfizer. *Swicegood,* 2010 WL 1138455, at *5 (burden is on defendant to show that the drug could not be made safer).

Although the burden rests with Pfizer, plaintiff alleges in her amended complaint that there are at least four (4) well known safer alternative products that are equally effective anticonvulsants, with a better safety profile, and with a lesser or no risk of SJS/TEN. Pfizer contends that these alternatives suggested by plaintiff are completely different products, and therefore, plaintiff has failed to allege a feasible alternative design to phenytoin. Assuming that the alternatives pled by plaintiff are completely different products from phenytoin,[13] the risk-utility analysis for design defect cases recognizes that when considering whether an alternative safer design existed, the factfinder may consider the feasibility of an alternative design as well as the "availability of an effective substitute for the product which meets the same need but is safer." *Banks v. ICI*

**12.** Plaintiff alleges that the phenytoin the decedent received from Trinity Hospital was manufactured by Pfizer, or, in the alternative, by Mylan. It is proper for plaintiff to plead alternative claims in her amended complaint until she learns by discovery which defendant manufactured the phenytoin ingested by the decedent. *See* FED.R.CIV.P. 8(d)(2).

**13.** The Court does not have sufficient information, such as the chemical makeup of the alternatives, affidavits, or expert testimony, to determine whether the alternatives listed by plaintiff are in fact completely different products as Pfizer asserts.

*Americas, Inc.,* 264 Ga. 732, 736 n. 6, 450 S.E.2d 671 (1994); *see also Bryant,* 262 Ga.App. at 409, 585 S.E.2d 723 (evaluating the risk utility factors of *Banks* in pharmaceutical drug context). Thus, plaintiffs allegations of substitute products for phenytoin may be sufficient under a risk-utility analysis. Therefore, the Court finds that plaintiff has sufficiently alleged a strict liability design defect claim against Pfizer.

### 5. Manufacturing Defect, against Pfizer & Mylan

Pfizer moves to dismiss plaintiff's claim for a manufacturing defect asserting that pursuant to Georgia law, in manufacturing defect cases, "it is assumed that the design of the product is safe and had the product been manufactured in accordance with the design it would have been safe for consumer use." *Banks,* 264 Ga. at 733, 450 S.E.2d 671. Pfizer argues that because plaintiff has not alleged that phenytoin was safe or that the specific medication ingested by the decedent deviated in construction or quality from any other phenytoin, plaintiff has not alleged a manufacturing defect claim. Plaintiff responds that she has not alleged a cause of action premised on any deviation in the manufacturing of phenytoin, and therefore, there is no manufacturing deviation claim to dismiss. However, plaintiff's amended complaint makes several references to a manufacturing defect, including the heading of her claim for strict liability. Thus, to be clear, the Court dismisses any manufacturing defect claims against defendants in light of Pfizer's argument and plaintiff's assertion in her response brief.

### C. Count Three—Fraud, against Pfizer

In its previous Order, the Court dismissed plaintiff's claim for fraud because plaintiff did not plead her claim with particularity sufficient to meet the standard of Fed.R.Civ.P. 9(b). *Moore,* 840 F.Supp.2d at 1350–51. Plaintiffs amended fraud claim is premised on Pfizer deliberately and intentionally misrepresenting and omitting certain material facts in the advertising, marketing, distribution, and sale of Pfizer's phenytoin products. Plaintiff asserts that Pfizer made false representations when it failed to include the results of tests showing the potential risks of serious adverse reactions and injuries associated with phenytoin "within the warning section of the label." Pl.'s Am. Compl. ¶ 59a; *see also id.* at 59j. Plaintiff lists nine (9) specific statements and warnings, which she contends Pfizer was aware of but failed to include in the label of phenytoin.

■ After a review of the parties' arguments, the Court agrees with Pfizer that plaintiff's fraud claim is essentially a failure to warn claim. In her amended complaint, plaintiff makes clear that her fraud claim is based on omissions, fraudulent statements, and misrepresentations in the label of Pfizer's phenytoin products and that Pfizer knew the accurate information regarding the risks of phenytoin but failed to disclose it in the warning sections of the phenytoin label. Therefore, the Court dismisses plaintiff's fraud claim because it is merely a failure to warn claim, which she has already alleged against Pfizer. *See Metz,* 872 F.Supp.2d at 1341–43 (concluding that the plaintiff's claims, while styled as a misrepresentation and fraudulent concealment claim, were preempted because they were premised on a failure to warn and make label changes); *Guarino v. Wyeth LLC,* 823 F.Supp.2d 1289, 1292 (M.D.Fla.2011) (finding that the plaintiff's fraud claim, along with other tort claims, was on its face premised on an allegedly inadequate warning).

### D. Counts Four and Five—Negligence and Gross Negligence, against Pfizer

The Court previously dismissed plaintiffs negligence and gross negligence

claims because plaintiff did not specify (1) which defendant breached what duty to plaintiff; (2) which products caused the decedent's injuries, including factual information about what he was prescribed and when; and (3) the specific injury the decedent suffered as a proximate result of each defendant's negligence. *Moore,* 840 F.Supp.2d at 1351–53.

■ The Court finds that plaintiff's amended complaint sufficiently alleges a negligence and gross negligence claim against Pfizer. As previously noted, plaintiff alleges in her amended complaint that the decedent "was prescribed three (3) × 100 mg EXT Phenytoin at Trinity Hospital of Augusta, Georgia, with the internal hospital code of 7210297, and a cost of $15.00 or $5.00 each, on December 20, 2008." Pl.'s Am. Compl. ¶ 15. Plaintiff asserts that this phenytoin was manufactured, marketed, and/or distributed by Pfizer, or in the alternative, by Mylan. Plaintiff alleges that Pfizer owed a duty to the decedent to use reasonable care in designing, testing, labeling, manufacturing, marketing, supplying, distributing, and selling phenytoin, including a duty to ensure that Pfizer's phenytoin products did not cause consumers to suffer from unreasonable, unknown, and/or dangerous side effects. Plaintiff asserts that Pfizer failed to exercise reasonable care in fulfilling this duty, specifically by failing to warn the decedent of known risks associated with phenytoin and not exercising an acceptable standard of care. Plaintiff lists the specific ways in which Pfizer allegedly breached a duty to the decedent and his prescribing physicians. *See* Pl.'s Am. Compl. ¶ ¶ 69a-g, 70a-j. In addition, plaintiff alleges that the

decedent suffered from specific injuries.[14] Finally, plaintiff has alleged a loss flowing from Pfizer's alleged breach of duty, which includes sever pain and suffering, loss of enjoyment of life, and ascertainable economic loss. Therefore, plaintiff has pled the elements of a negligence claim. *See Dixie Group, Inc. v. Shaw Indus. Group,* 303 Ga.App. 459, 467, 693 S.E.2d 888 (2010) (listing elements for a negligence claim). Finally, plaintiff has pled the additional necessary elements for gross negligence. *See Heard v. City of Villa Rica,* 306 Ga.App. 291, 294, 701 S.E.2d 915 (2010) (defining gross negligence as the failure to exercise even a slight degree of care or lack of diligence that even careless men are accustomed to exercise).

In its previous Order, the Court noted that it was unclear whether plaintiff intended to bring a negligent failure to warn claim and a negligent design defect claim against Pfizer in addition to, and separate from, her claims of strict liability for failure to warn and strict liability for a design or manufacturing defect. Regarding a negligent design defect claim and a strict liability claim for a design defect, both claims use the same risk-utility analysis, and therefore, will be treated as one claim. *See Kelley v. Hedwin,* 308 Ga.App. 509, 511, 707 S.E.2d 895 (2011) (applying the risk-utility analysis from *Banks* to a negligent design defect claim); *see also Inam Int'l. Inc. v. Broan–Nutone LLC,* 1:05–CV–0852–CAP, 2007 WL 4730649, at *12 n. 12 (N.D.Ga. Sept. 21, 2007) (applying risk-utility analysis to negligent design defect claim and noting that this Court has recognized that there is no significant dis-

14. The injuries listed by plaintiff in the amended complaint contain the same language—"including but not limited to"—as the original complaint, which the Court criticized in dismissing plaintiff's negligence claims. *Moore,* 840 F.Supp.2d at 1352. However, plaintiff has now pled factual information in the amended complaint about what product the decedent was prescribed and when, sufficient to allege a causal connection between the decedent's taking of phenytoin and his injuries and sufficient to apprise Pfizer of plaintiffs claim.

tinction between negligence and strict liability for purposes of the risk-utility analysis).

With regard to plaintiff's failure to warn claim, she is bringing a failure to warn claim based on both strict liability and negligence. *See* 63A Am Jur 2d Products Liability § 1013 (noting that a cause of action may arise in either negligence or strict liability for failure to warn); *see also Barger v. Garden Way,* 231 Ga.App. 723, 724, 499 S.E.2d 737 (1998) (alleging separate theories of recovery for strict liability for failure to warn and negligent failure to warn). As part of plaintiff's negligence and gross negligence claims, plaintiff alleges that Pfizer failed to warn the decedent, other consumers, and decedent's prescribing physicians. Plaintiff's negligent failure to warn claim is limited by the learned intermediary doctrine to a failure to warn the decedent's physicians and does not apply to a failure to warn the public at large or the decedent. See discussion, *supra; see Dietz v. Smithkline Beecham Corp.,* 598 F.3d 812, 815–16 (11th Cir.2010) (finding that the learned intermediary doctrine was applicable to the plaintiff's claim for strict liability and negligent failure to warn); *Lakey v. Mentor Corp.,* CIV. A.1:05CV929TCB, 2007 WL 4811929, at *4–5 (N.D.Ga. Mar. 30, 2007) (granting summary judgment for the defendant on plaintiff's negligent claim for failure to warn due to learned intermediary doctrine).

E. Preemption of State Law Claims Under *Buckman*

For plaintiff's claims for failure to warn, fraud, negligence, and gross negligence, Pfizer argues that plaintiff seeks to hold Pfizer liable for failure to comply with the requirements of the FDCA and its regulations implemented by the FDA. Pfizer contends that these claims are preempted under *Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001), because they conflict with federal law, since only the federal government can sue for violations of the FDCA or its regulations.

Plaintiff argues in response that her claims are not preempted under *Buckman* because the U.S. Supreme Court in *Wyeth,* 555 U.S. 555, 129 S.Ct. 1187 (2009), recognized that the FDCA is designed only to supplement or bolster state law consumer protections against harmful products, and state law failure-to-warn claims are the primary mechanism for enforcing drug manufacturers' responsibilities regarding their product labels. Plaintiff contends that *Buckman* is inapplicable because her claims do not "police any federal agency" as did the claims in *Buckman.* Pl.'s Resp. to Pfizer's Mot. to Dismiss at 13.

In *Buckman,* the plaintiffs alleged that the defendant made fraudulent representations to the FDA about orthopedic bone screws' potential use in the spine in order to gain FDA approval. 531 U.S. at 341, 121 S.Ct. 1012. The plaintiffs contended that the FDA would not have approved the screws and therefore the plaintiffs would not have been injured but for this fraud. *Id.* at 347, 121 S.Ct. 1012. The U.S. Supreme Court held that the FDCA impliedly preempted the plaintiffs' state law fraud claims because the claims conflicted with federal law. *Id.* at 348, 121 S.Ct. 1012. The court explained that the federal statutory scheme empowered the FDA to punish and deter fraud thereby creating a delicate balance of statutory objectives, and that the balance would be skewed by allowing fraud-on-the-FDA claims under state tort law. *Id.* Therefore, "[s]tate-law fraud-on-the-FDA claims inevitably conflict[ed] with the FDA's responsibility to police fraud consistently with the [FDA's] judgment and objectives." *Id.* at 350, 121 S.Ct. 1012.

Specifically, the court explained that the defendants were required to make disclosures to the FDA pursuant to the FDCA and the Medical Devices Amendments of 1976 ("MDA"). *Id.* at 347, 121 S.Ct. 1012. The "very subject matter of [the defendant's] statements were dictated by [the MDA's] provisions." *Id.* at 347–48, 121 S.Ct. 1012. The court found that the plaintiffs' claims existed "solely by virtue of the FDCA disclosure requirements." *Id.* at 353, 121 S.Ct. 1012. The court stated that the federal disclosure requirements of the MDA were critical to the plaintiffs' case and formed the basis for their fraud claims instead of traditional theories of state law. *Id.*

The sections of plaintiff's amended complaint, which Pfizer contends are premised on FDCA violations and are preempted, are as follows:

- "Pfizer Defendants violated the applicable code of federal regulations by failing to include a warning that these life threatening conditions were known side effects from the ingestion of phenytoin." Pl.'s Am. Compl. ¶ 17 (under heading "Factual Background").

- "[T]he Pfizer Defendants failed to amend their label to bring it in compliance with federal law." *Id.*

- "Under federal safety regulations, there is a duty to place the risk of danger in the warning section of a label if there are sufficient data to support that data." *Id.* ¶ 59(a) (fraud).

- "Defendants failed to include within their label all warnings required by federal law." ¶ 69(d) (negligence).

- "Pfizer Defendants failed to properly include morbidity and mortality data as required by federal law." *Id.* ¶ 83(c)(3) (gross negligence).

- Pfizer's phenytoin "label placed consumers at risk because it failed to inform their physicians of known risks required by FDA regulations and/or Georgia law." *Id.* ¶ 84.

▪▪▪ The Court is not persuaded by Pfizer's arguments that *Buckman* preempts plaintiff's claims. Unlike *Buckman*, plaintiff does not allege here that Pfizer committed fraud on the FDA, or more specifically, that the FDCA required Pfizer to make disclosures to the FDA and Pfizer made misrepresentations to the FDA when submitting information to the agency. Indeed, plaintiffs amended complaint does not even mention the FDCA. Therefore, plaintiff's claims do not conflict with the FDA's responsibility to police fraud. *See Lefaivre v. KV Pharm. Co.,* 636 F.3d 935, 941–944 (8th Cir.2011) (no field preemption because the regulation of drugs is not so pervasive in scope that it occupies the field and instead the FDA has traditionally regarded state law as a complementary form of drug regulation, and no conflict preemption because no claims involving fraud on the FDA).

In *Buckman,* the disclosure requirements of the MDA were critical to the plaintiffs' fraud claim because the duty to report to the FDA arose from the MDA. 531 U.S. at 353, 121 S.Ct. 1012. Thus, the plaintiffs' claim for fraud could not exist without the MDA reporting requirements. *Id.* at 352–53, 121 S.Ct. 1012. Unlike *Buckman,* plaintiff's claims do not exist solely because of FDCA or MDA reporting requirements to the FDA. Instead, plaintiff's state law claims would exist absent the FDCA because her claims arise from state tort law and "not solely from the violation of FDCA requirements." *Id.* at 352, 121 S.Ct. 1012; *Fulgenzi v. Wyeth,* 686 F.Supp.2d 715, 723 (N.D.Ohio 2010) (finding no preemption where the plaintiff's fraud claims arose under state law and did not exist solely by virtue of federal drug regulations); *Couick v. Wyeth, Inc.,*

3:09–CV–210–RJC–DSC, 2009 WL 4644394, at *5 (W.D.N.C. Dec. 7, 2009) (finding no preemption where the plaintiff's fraud claims arose from state law and would exist as state-law claims absent the FDCA).

Plaintiff's claims arise from Pfizer committing an alleged harm on consumers, the decedent, and his physicians, failing to use reasonable care, and failing to warn of the risks of phenytoin, whereas in *Buckman,* the claims arose from committing fraud on the FDA. *Lefaivre,* 636 F.3d at 944 (finding *Buckman* distinguishable because the misrepresentations in *Buckman* were made to the FDA itself whereas in the case before the court the plaintiff contended that the harm was perpetrated against consumers); *Couick,* 2009 WL 4644394, at *5 (the fraud claims at issue focused on fraud that was allegedly perpetrated against patients and doctors rather than the FDA); *see also Fulgenzi,* 686 F.Supp.2d at 724 (same, relying on *Couick* ). Thus, plaintiffs claims are based on state law duties rather than requirements from the FDCA.

It is true that plaintiff has framed her claims as Pfizer having violated federal regulations and federal law. However, "simply because conduct violates the FDCA does not mean a state-law claim based on that same conduct depends on the FDCA's existence." *Couick,* 2009 WL 4644394, at *5. Plaintiff's claims sound in state tort law, and evidence of Pfizer's violations of federal regulations may show that Pfizer breached a duty under state law. *See Bausch v. Stryker Corp.,* 630 F.3d 546, 557–58 (7th Cir.2010) (finding no preemption and noting that "evidence showing a violation of federal law ... goes a long way toward showing that the manufacturer breached a duty under state law toward the patient."). Therefore, plaintiff's state law claims exist separately from the FDCA, even though they may allege a violation of FDA requirements. *See Hughes v. Boston Scientific Corp.,* 631 F.3d 762, 775 (5th Cir.2011) (no preemption for claim that the defendant failed to provide adequate warnings of dangers or risks associated with the product because this claim was based on a state duty to warn even though the plaintiff sought to prove that the defendant violated FDA regulations); *Fulgenzi,* 686 F.Supp.2d at 724 (finding no preemption, even if the claims alleged that the defendants violated federal drug regulations because the claims sounded in state tort law and would exist even without federal regulations); *Couick,* 2009 WL 4644394, at *5 (the plaintiff's allegations, "while potentially in violation of the FDCA, would exist as state-law claims absent the FDCA.")

Therefore, the Court concludes that plaintiff's state law claims for failure to warn, negligence, and gross negligence are not preempted under *Buckman. See Lefaivre,* 636 F.3d at 941–944 (no field or conflict preemption); *Hughes,* 631 F.3d at 775 *Bausch,* 630 F.3d at 557–58 (no preemption because state tort claims were based on manufacturing defects and not fraud on a federal agency); *Fulgenzi,* 686 F.Supp.2d at 723; *Couick,* 2009 WL 4644394, at *5.

### F. Count Eleven—Punitive Damages

Pfizer and Mylan move to dismiss plaintiff's claim for punitive damages arguing that it must be dismissed because plaintiff has failed to state a product liability claim upon which relief could be granted. Additionally, Mylan contends that plaintiff's punitive damages claim is based on a claim that Mylan failed to withdraw phenytoin from the market.

The Court having dismissed plaintiff's claims against Mylan, plaintiff's claim for punitive damages is also dismissed against Mylan. *See Mann v. Taser Int'l, Inc.,* 588

F.3d 1291, 1304 (11th Cir.2009). The Court finds that plaintiff's claim for punitive damages against Pfizer is sufficiently pled.

### G. Summary

Accordingly, the Court dismisses with prejudice plaintiff's claims for strict liability defective design, including a failure to warn and failure to withdraw from the market, against Mylan. The Court dismisses with prejudice any claim for a manufacturing defect against Pfizer or Mylan. The Court dismisses with prejudice plaintiff's claim against Pfizer for fraud because it is a restatement of her failure to warn claim. The Court dismisses with prejudice plaintiff's claim against Pfizer for a failure to warn the public or the decedent. The following claims will proceed against Pfizer: (1) failure to warn the decedent's physicians; (2) strict liability defective design; (3) negligence; (4) gross negligence; and (5) punitive damages.[15]

*Conclusion*

For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PART defendants' motions to dismiss [# 31] and [# 32]; GRANTS Pfizer's motion for joinder in Mylan's motion to dismiss [# 33]; DISMISSES WITH PREJUDICE all claims against defendants Mylan, Inc. f/k/a Mylan Laboratories, Inc.; Mylan Bertek Pharmaceuticals, Inc.; and Mylan Pharmaceuticals, Inc.; DISMISSES WITH PREJUDICE any manufacturing defect claim against Pfizer; and DISMISSES WITH PREJUDICE plaintiffs

claims for fraud and a failure to warn the decedent or the public against Pfizer.

IT IS SO ORDERED.

---

**15.** Plaintiff has once again requested leave to amend her complaint if the Court finds that dismissal of any of her claims is appropriate. The Court has already given plaintiff a chance to amend her complaint and will not grant her perpetual bites at the apple. *See Bank v. Pitt,* 928 F.2d 1108, 1112 (11th Cir.1991) (overruled in part by *Wagner v. Daewoo Heavy Indus. Am. Corp.,* 314 F.3d 541, 542 (11th Cir.2002)o (en banc)) ("Where a more carefully drafted complaint might state a claim, a plaintiff must be given *at least one chance* to amend the complaint before the district court dismisses the action with prejudice.") (emphasis added).